John Eugene SELLNER

v.

George James PANAGOULIS, etc., et al.

John Eugene SELLNER

v.

Arthur A. MARSHALL, Jr., etc., et al.

Civ. Nos. K–81–2798, K–81–3086.

United States District Court,
D. Maryland.

Dec. 29, 1982.

---

John Eugene Sellner, plaintiff, in pro. per., in Civil Nos. K–81–2798 and K–81–3086.

Robert B. Ostrom, County Atty., Michael O. Connaughton, Deputy County Atty., and Sherrie L. Krauser, Associate County Atty., Upper Marlboro, Md., for defendant George J. Panagoulis in Civil No. K–81–2798 and for defendants Lawrence J. Hogan, John E. McHale, Jr., John W. Rhoads, Joseph D. Vasco, Jr., James Ross and Prince George's County in Civil No. K–81–3086.

John R. Foran and Horowitz, Oneglia, Goldstein, Foran & Parker, P.A., College Park, Md., for defendants John Albert Geier, Betty Mae Geier, Deborah Lynn Edwards and Gene Berry in Civil No. K–81–2798.

Defendants Claire Cecelia Panagoulis, Charles Steven Panagoulis, Evelyn Jean Davis and Lobeda Elizabeth Johnson, defendants, in pro. per. in Civil No. K–81–2798.

Stephen H. Sachs, Atty. Gen.; State of Md., and Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore, Md., for defendants Arthur A. Marshall, Jr., and John L. McComas, Jr., in Civil No. K–81–3086.

FRANK A. KAUFMAN, Chief Judge.

 Plaintiff John Eugene Sellner, proceeding *pro se*, instituted *Panagoulis* on October 29, 1981, and *Marshall* on December 2, 1981. There are a number of factual allegations asserted by Sellner which are common to the two cases and which are taken as true, along with all reasonable inferences in plaintiff's favor running from them, for purposes of the summary judgment motions filed by defendants.

### PLAINTIFF'S FACTUAL ALLEGATIONS *

Sellner, a resident of Prince George's County, Maryland, was an active member of the Prince George's County Police Depart-

---

* The recitals set forth under this heading are recitals of Sellner's allegations and do not constitute factual findings or conclusions of this Court as to the truth or non-truth of those allegations.

ment (Department) from March 11, 1952, until July 1, 1974, at which time he retired with the rank of Sergeant. In January 1977, Sellner became convinced that James Robert Panagoulis was the prime suspect in connection with the January 26, 1968 death of Martha Ann Hudnall, that the death was caused by murder, that the alleged murder was unsolved in January 1977 and had been covered up by James Panagoulis's father, George J. Panagoulis, one of defendants in *Panagoulis,* who, as of January 1968, was Chief of Police for Prince George's County,[1] that then-Chief Panagoulis had involved several members of the Department in removing his son, James, from the State of Maryland in order to prevent the latter's apprehension as the prime suspect in the murder, and that witnesses had observed James Panagoulis at the scene of the murder. Sellner has known James Panagoulis since James was twelve years old, at which time the latter's father became Chief of Police in 1955. Sellner was present in October 1966 when James Panagoulis was brought to the police station in Seat Pleasant, Maryland, charged with assaulting his estranged wife, whom Sellner claims, was the subsequent murder victim, Martha Ann Hudnall.

After Sellner learned of the 1968 cover-up, Sellner "elect[ed] to conduct a free lance investigation" of the unsolved murder of Martha Ann Hudnall "after notifying State's Attorney Marshall [one of defendants in *Marshall*] ... and other appropriate authorities" that James Panagoulis was the prime suspect in connection with the murder of Martha Ann Hudnall. Subsequently, in May 1977, Sellner located James Panagoulis in Montrose, West Virginia. The latter was then using the alias George Albert Hudnall. Sellner's further investigation revealed that James Panagoulis and George Hudnall had switched lives and identities, in a transition which began on October 14, 1960, at City Post Office, Washington, D.C., continued on November 24, 1962, when James Panagoulis posing as George Hudnall married Martha Ann Geier

(who subsequently became the murder victim Martha Ann Hudnall), and culminated with a switch of employment which was finalized in June 1966. George Panagoulis and his wife, Claire Cecelia Panagoulis, also a defendant in *Panagoulis,* aided and participated in the switch of identities and lives between their son, James Panagoulis, and George Hudnall.

Sellner reported that James Panagoulis was the prime suspect in the murder of Martha Ann Hudnall to Arthur A. Marshall, Jr., the State's Attorney for Prince George's County and one of defendants in *Marshall.* Marshall then directed State's Attorney Investigator John L. McComas, Jr., Major James Ross and Lt. Col. Joseph D. Vasco, Jr., of the Department (McComas, Ross and Vasco all being defendants in *Marshall*) and others to conduct an investigation of the unsolved murder. However, Marshall and said investigators knowingly, willingly and deliberately participated in the cover-up of the identity of the murder of Martha Ann Hudnall by switching the identities of James Panagoulis and George Hudnall on May 24 and July 12, 1977, during proceedings conducted by the Prince George's County Grand Jury April 1977 Term (the "1977 grand jury switch"), thereby obstructing that Grand Jury from returning any indictments and maintaining the status quo of Chief Panagoulis's 1968 cover-up.

Sellner's efforts to appear before subsequent grand juries were thwarted by Marshall and McComas who rejected the presentation of any new evidence. On December 2, 1980, Sellner received a letter from Marshall "completely den[ying] plaintiff access to the Courts." That letter, attached as Exhibit D to Sellner's Complaint in *Marshall,* advised Sellner that Marshall had given instructions "to nolle pros any charging document that might be issued by the Commissioner upon [Sellner's] application," but suggested that Sellner contact either the Maryland State Prosecutor or the Maryland State Attorney General's Office "and advise them that I [Marshall] would be most happy

---

**1.** Panagoulis retired as Chief of Police on July 1, 1968.

to assist them in any way they deem appropriate to prosecute allegations of wrongdoing, which you [Sellner] might bring to the attention of the courts."

In a letter dated February 4, 1981, attached as Exhibit E to Sellner's Complaint in *Marshall,* the Foreman of the Prince George's County Grand Jury October 1980 Term invited Sellner to appear before that Grand Jury "for the purpose of presenting new evidence in the Martha Ann Hudnall murder case." However, Marshall effectively obstructed that Grand Jury from returning any indictments "by refusing to obtain documents, records or summoned [sic] or provide an assistant State's Attorney to guide the Grand Jury."

Beginning in January 1978, Sellner went "public" with his information concerning the cover-up of the identity of the murderer of Martha Ann Hudnall and the 1977 grand jury switch. As a result of publicizing that information, Sellner was sued in this Court for libel and slander by James Panagoulis, whom Sellner alleges was using the alias George Hudnall, in Civil No. HM–78–1451. The subsequent publicity which ensued from the filing of that suit led Sellner to learn of the whereabouts of the "real" George Hudnall, whom Sellner observed on December 6, 1978, in Coral Springs, Florida. Sellner further learned that the "real" George Hudnall had been living in Florida since May 1968 under the alias of James Panagoulis. Then on April 18, 1979, Sellner obtained a warrant in Montgomery County, Maryland, for James Panagoulis alias George Hudnall for committing bigamy on May 10, 1969, when he (Panagoulis) married his then-current wife, Carol May Vandevender, also a plaintiff in Civil No. HM–78–1451. That warrant was subsequently *nolle prosequied* by Montgomery County Deputy State's Attorney Timothy E. Clarke as a result of action taken by former Chief Panagoulis, McComas, Ross and several of the defendants in *Panagoulis.* A subsequent warrant for bigamy was *nolle prosequied* on December 20, 1979. A third such warrant was filed on January 8, 1981, but apparently was not executed.

On April 20, 1979, Sellner was sued by the "real" George Hudnall under the alias James Panagoulis in Civil No. HM–79–786. In June 1979 that case was consolidated with Civil No. HM–78–1451. The consolidated actions went to trial in July 1981 before Judge Ramsey of this Court as Civil No. R–78–1451. After a ten-day trial, plaintiffs therein obtained a large monetary judgment against Sellner, a judgment which Sellner claims resulted from a conspiracy among the defendants in *Panagoulis* to conceal the true identity of plaintiffs in Civil No. R–78–1451 in order to avoid involvement of those defendants as accessories to the bigamous marriage of James Panagoulis (acting under the alias George Hudnall) to Martha Ann Geier (the subsequent murder victim Martha Ann Hudnall) on November 24, 1962, and as accessories to the subsequent murder of Martha Ann Hudnall on January 26, 1968.

Sellner also claims that the judgment against him in Civil No. R–78–1451 resulted from the conspiracy among Marshall, Vasco, Ross, McComas and John W. Rhoads, former Chief of Police for Prince George's County, all defendants in *Marshall,* to obstruct justice by concealing the true identity of the two male plaintiffs in Civil No. R–78–1451 and from the failure and refusal of Lawrence J. Hogan, County Executive for Prince George's County, and John E. McHale, Jr., Chief of Police for Prince George's County, both also defendants in *Marshall,* to take appropriate executive and police action with regard to the 1968 cover-up and the 1977 grand jury switch.

Sellner contends that as of today the cover-up of the switch of identities and lives between James Panagoulis and George Hudnall conceals a multitude of crimes including two bigamous marriages (one each by Panagoulis and Hudnall) and three unsolved murders in addition to the unsolved murder of Martha Ann Hudnall and that James Panagoulis is the prime suspect in all four murders.

### PROCEDURAL POSTURE OF THESE CASES

In *Panagoulis,* Sellner has named as defendants George James Panagoulis, the fa-

ther of James Panagoulis, individually and in his former official capacity as former Chief of Police for Prince George's County; Claire Cecelia Panagoulis and Charles Steven Panagoulis, mother and brother, respectively, of James Panagoulis; John Albert Geier, Betty Mae Geier and Deborah Lynn Edwards, father, mother and sister, respectively, of the murder victim Martha Ann Hudnall; Evelyn Jean Davis and Lobeda Elizabeth Johnson, sister and first cousin, respectively, of George Hudnall; Gene Berry, a former co-worker of George Hudnall; and William Michael Holmes, a friend of James Panagoulis and a former co-worker (along with defendant Berry) of George Hudnall.

All defendants in *Panagoulis* except Holmes have been served. Some of those defendants have filed answers or other pleadings responsive to the complaint; all of them (except Holmes) have now filed motions for summary judgment pursuant to Fed.R.Civ.P. 56. At a hearing in open Court, Sellner, in response to questioning by the Court, stated that he wanted to proceed without the unserved defendant Holmes and was not pressing his claims against the latter.

Essentially, Sellner alleges that all of the defendants in *Panagoulis* have full knowledge that James Panagoulis and George Hudnall have switched identities and lives, that James Panagoulis is responsible for the unsolved murder of Martha Ann Hudnall as well as for other crimes, and that Panagoulis and Hudnall helped to bring about that switch of identities and lives in order to conceal Panagoulis's responsibility for those crimes. Sellner claims that "[d]efendants have entered into a conspiracy that deprives plaintiff of his civil rights by obstructing justice in concealing the true identity of the person responsible for the unsolved MURDER [sic] of Martha Ann Hudnall on January 26, 1968, and that defendants' unlawful action has resulted in other major crimes being committed and other persons being denied equal protection and equal enforcement of the laws." Sellner also alleges that said conspiracy among defendants "has subjected plaintiff to an ostentatious and pro-longed investigation by Maryland law enforcement authorities, thereby proclaiming to the public that plaintiff deserved surveillance," and "denied the victim of her right to life and the civil rights of the plaintiff and every other person similarly situated."

In *Marshall,* Sellner has named as defendants Arthur A. Marshall, Jr., individually and in his official capacity as State's Attorney for Prince George's County; Lawrence J. Hogan, individually and in his official capacity as County Executive for Prince George's County; John E. McHale, Jr., individually and in his official capacity as Chief of Police for Prince George's County; John W. Rhoads, individually and in his former official capacity as former Chief of Police for Prince George's County; Joseph D. Vasco, Jr., and James Ross, individually and in their official capacities as police officers with the Department; John L. McComas, Jr., individually and in his official capacity as a police officer/State's Attorney's Investigator for Prince George's County; and Prince George's County. Each of the above defendants has been served and has filed answers or other pleadings responsive to the complaint. All of them have filed motions for summary judgment pursuant to Fed.R.Civ.P. 56.

Essentially, Sellner, in *Marshall,* alleges that defendant Marshall participated in the 1977 grand jury switch in order to maintain the status quo of the 1968 cover-up, that Marshall inhibited Sellner's access to the Courts and that Marshall obstructed one or more grand juries from returning any indictments in connection with said murder by refusing to obtain documents or records, to summons witnesses, or to provide the grand juries with an Assistant State's Attorney.

Sellner contends that defendants Hogan, McHale and Rhoads have failed or refused to take proper executive or police action, as the case may be, with regard to the unsolved murder of Martha Ann Hudnall and the subsequent cover-up of the identity of the murderer. Sellner also alleges that McHale has refused to take action with

regard to several complaints filed by Sellner with the Department's Internal Affairs Section against defendants Vasco, Ross and others. Sellner further claims that Rhoads, with full knowledge that James Panagoulis and George Hudnall have switched their identities and that that switch conceals many major crimes, permitted his subordinates Vasco and Ross to switch the identities of Panagoulis and Hudnall before the grand jury in 1977 and that Rhoads's car was used as the getaway car from the scene of the murder of Martha Ann Hudnall.

Sellner alleges that defendants Vasco and Ross performed the 1977 grand jury switch in order to maintain the status quo of the 1968 cover-up. Sellner also claims that Vasco, as assistant Chief and former acting Chief of Police for Prince George's County, failed and refused to take proper police action with regard to the unsolved murder by directing all personnel in the Department not to cooperate with Sellner and that Vasco, as a detective in 1968, with full knowledge of the switch of identities between James Panagoulis and George Hudnall, played a direct role in the cover-up of the murder of Martha Ann Hudnall by, *inter alia,* removing the prime suspect, James Panagoulis, from the state.

Defendant McComas, in addition to participating in the 1977 grand jury switch, is alleged by Sellner to have "systematically conducted a campaign to assassinate the character of the plaintiff to the extent that plaintiff was the subject of an intensive investigation by Maryland State Police, West Virginia State Police, Montgomery County Police, U.S. Postal Inspectors and other law enforcement agencies."

Finally, Sellner contends that defendant Prince George's County "authorized and ratified the unlawful and unconstitutional acts of the conspiracy as outlined in this complaint and failed properly to train, supervise and discipline those who carried out the unlawful acts of this complaint."

Sellner claims that defendants, in *Marshall,* acting under color of state law, have deprived plaintiff of his constitutionally protected rights, privileges and immunities in violation of 42 U.S.C. § 1983, and have conspired to do the same in violation of 42 U.S.C. §§ 1985 & 1986. Further, Sellner contends in *Marshall* that "defendants' unlawful and unconstitutional conspiracy to obstruct the due course of justice, has deprived the plaintiff, the victims, and every other person similarly situated, due process, equal protection and equal enforcement of the laws." Finally, Sellner states in *Marshall* what appear to be two state-law causes of action, one for intentional or reckless infliction of emotional distress and one for defamation.

In both *Panagoulis* and *Marshall,* subject-matter jurisdiction is alleged to exist under 28 U.S.C. §§ 1331 & 1343, and compensatory and punitive damages are sought against all defendants.

### CLAIMS UNDER 42 U.S.C. §§ 1985 & 1986

■ In both *Panagoulis* and *Marshall,* Sellner proceeds against the defendants under 42 U.S.C. §§ 1985 and 1986. Section 1985 [2] is composed of three subsections.

---

**2. § 1985.** *Conspiracy to interfere with civil rights*

(1) If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

(2) If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the

Subsection (1) provides a cause of action against persons who "conspire ... by force, intimidation, or threat" (a) "to prevent ... any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging the duties thereof"; (b) "to induce ... any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed"; (c) "to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof"; or (d) "to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties." Section 1985 is inapplicable herein because Sellner has not alleged that he is or ever was an officer of the United States or that he ever sought or was offered a position as such an officer. Rather, Sellner alleges that at all relevant times he was a retired Prince George's County Police Sergeant, who, as a private citizen, has been conducting a free lance investigation of an unsolved crime.[3]

Section 1985(2) is difficult to parse and its "perfidious syntax" must be approached with care. *See Brawer v. Horowitz*, 535 F.2d 830, 837 (3d Cir.1976) (Aldisert, J.). A semicolon divides section 1985(2) into two parts. *See id.* at 840; *Hahn v. Sargent,* 523 F.2d 461, 469 (1st Cir.1975) (Coffin, J.), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The first part of section 1985(2), that is, everything before the semicolon, is composed of a number of clauses; the second part of section 1985(2), that is, everything after the semicolon, could be said to be composed of at least two clauses. For convenience purposes, the clauses of the first part of section 1985(2) will be divided into three groups and designated as Clauses A, B and C and the clauses of the second part of section 1985(2) will be divided into two parts and designated as Clauses D and E.

The first part of section 1985(2) is directed broadly at the protection of "witnesses, parties and grand or petit jurors from conspiracies to pressure or intimidate them in the performance of their duties." *Brawer,* 535 F.2d at 839. Clause A provides a cause of action against "persons ... [who] conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein ...." *See Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 343 (5th Cir.) (Ainsworth, J.) (en banc), *cert. denied,* 454

purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

3. Even if Sellner had been at any time an officer of the United States or had had the prospect of becoming the same, he has not, in any of his voluminous filings in these cases, alleged that any defendant in either case ever subjected him (Sellner) to any "force, intimidation or threat." Thus, 42 U.S.C. § 1985(1) is inapplicable for that reason as well. *Williams v. St. Joseph Hospital,* 629 F.2d 448, 451 (7th Cir. 1980).

U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). Clause B provides a cause of action against persons who so conspire "to injure such party or witness in his person or property on account of his having so attended or so testified . . . ." *See id.* Finally, Clause C provides a cause of action against persons who so conspire "to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror."

Sellner has not stated a cause of action under any of what have been designated as Clauses A, B or C of the first part of section 1985(2). The first part of section 1985(2), like section 1985(1), requires "force, intimidation, or threat," *see Williams v. St. Joseph Hospital,* 629 F.2d 448, 451 (7th Cir. 1980), and, as stated *supra,* Sellner has nowhere alleged that any defendant in either of these two cases ever subjected him to any "force, intimidation, or threat." Also, insofar as Clauses A and B are concerned, Sellner's allegations, at most, add up to a claim that the defendants in *Panagoulis* conspired to commit perjury in Civil No. R–78–1451. Construed most favorably to Sellner's cause, those allegations do not amount to any claim that any action was taken against Sellner by any defendant (a) to prevent Sellner from attending or testifying in any court of the United States or (b) to injure Sellner in his person or property for having so attended or so testified. As for Clause C, Sellner was not, and does not allege, that he was a grand or petit juror. Further, the "racial or . . . otherwise class-based, invidiously discriminatory animus" requirement applicable to actions under section 1985(3), *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798,

29 L.Ed.2d 338 (1971), applies equally to the first part of section 1985(2). *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d at 346–47.[4]

Clause D of the second part of section 1985(2) provides a cause of action against "persons [who] conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws . . . ." *See Kimble,* 648 F.2d at 343. Clause E of the second part of section 1985(2) provides a cause of action against persons who so conspire "to injure [such citizen] or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *See id.*

■ Sellner has not stated a claim for relief under the second part of section 1985(2). Congress intended the second part of section 1985(2) "to guard against conspiracies the object of which is to deny citizens the equal protection of the laws." *Brawer v. Horowitz,* 535 F.2d at 839. Those circuits which have considered the question have unanimously held, in the light of the Supreme Court's decision in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), that the second part of section 1985(2) requires a showing that defendants were motivated by racial or other class-based, invidiously discriminatory animus.[5]

As to section 1985(3), it is, as stated *supra,* necessary, in order to state a cause of action under section 1985(3), that a plaintiff allege "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798.[6] Sellner has made no allegation

---

**4.** *Jones v. United States,* 401 F.Supp. 168, 173 (E.D.Ark.1975), *aff'd,* 536 F.2d 269 (8th Cir. 1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 735, 50 L.Ed.2d 750 (1977).

**5.** *See Williams v. St. Joseph Hospital,* 629 F.2d at 451; *Slavin v. Curry,* 574 F.2d 1256, 1262 (5th Cir.) (and cases cited therein), *modified in other respects,* 583 F.2d 779 (5th Cir.1978); *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.),

*cert. denied,* 436 U.S. 906, 98 S.Ct. 2238, 56 L.Ed.2d 405 (1978).

**6.** Whether § 1985(3) reaches beyond racial discrimination has not been decided by the Supreme Court, *Griffin,* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9, or the Fourth Circuit, *Rogers,* 582 F.2d at 317. Herein, there are no racial allegations stated by *Sellner.* However, it is

which even inferentially indicates that any defendant was motivated by any class-based, invidiously discriminatory animus. In fact, Sellner has not referred to any class of persons whose civil rights were allegedly violated as a result of defendants' conspiracy.

■ In *Rogers v. Tolson*, 582 F.2d 315 (4th Cir.1978), plaintiffs, alleging that they had been deprived of equal protection of the law by the installation of a sewerage system across plaintiffs' property, an action taken by the town commissioners because of plaintiffs' "outspoken ... criticisms" of the commissioners, claimed to be "members of a class consisting of 'those who are in political and philosophical opposition to [the commissioners], and who are, in addition, outspoken in their criticisms of the [commissioners'] political and governmental attitudes and activities.'" *Id.* at 317. Judge Butzner held that the claimed class was defined in "vague and amorphous terms" and was not an appropriate class within the requirements of section 1985(3). *Id.* at 318. In order to allege class-based discrimination, a complaint must specify an objectively identifiable group of which the plaintiff is a member. The allegations of Sellner's complaint in these cases revolve around circumstances so unique that it appears most unlikely, if not impossible, that defendants were motivated by any invidiously discriminatory animus toward any persons or class of persons other than Sellner, if indeed defendants were motivated by any animus toward Sellner at all. Certainly, according to Sellner's allegations, defendants were not motivated by any animus toward any persons or class of persons cognizable under section 1985(2) (second part) or section 1985(3).[7] Indeed, it appears that Sellner believes that defendants were motivated not by any class-based animus but by a desire to cover up a murder and to avoid implicating themselves in that murder and/or its cover-up.

In *Hughes v. Ranger Fuel Corp.*, 467 F.2d 6 (4th Cir.1972) (Russell, J.), plaintiffs were allegedly assaulted by defendants as plaintiffs were attempting to photograph the alleged pollution of a river by defendants for purposes of securing photographic evidence of violations of environmental laws for prospective use in court proceedings. Plaintiffs sought injunctive relief and damages under section 1985(3). The Fourth Circuit upheld the district court's dismissal of the complaint on the ground that plaintiffs had failed to allege any class-based, invidiously discriminatory animus. Judge Russell wrote, in words which are appropriately applicable to the instant situation:

> Nowhere in their complaint do the plaintiffs base their constitutional claim on a conspiracy generated by a class-motivated animus to deprive them of either "equal protection of the law" or "equal privileges and immunities" under the laws or the exercise of any constitutional freedom to travel but rather plant their constitutional deprivations on their contention that, as private law investigators, and self-appointed enforcers of the law, they could not be restricted or interfered with in their quest for evidence of federal criminal violation. It would be a mischievous doctrine, indeed, fraught with great threat to constitutional rights to invest self-anointed "informers", however commendable their purposes, with any such powers and rights as asserted by the plaintiffs, and certainly Section 1985(3) does not purport to do so.

*Id.*, 467 F.2d at 10–11 (footnote omitted).

In *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743 (10th Cir.1980), *cert. denied*, 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981), officials of the defendant company were alleged to have conspired to prevent plaintiff Silkwood and other Kerr-McGee employees from organizing a labor union. Additionally, certain agents of the FBI were alleged to have joined the conspiracy, after the death of plaintiff Silkwood, for the purpose of participating in the cover-up

---

assumed, *arguendo* only, that racial bias is not required in order to bring § 1985(3) into play.

**7.** *See, e.g., Scott v. Moore*, 680 F.2d 979, 991–92 (5th Cir.1982) (en banc); *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d at 347.

of the prior conspiratorial activities. All defendants were said to have "covered up information" and to have given "false reports to various federal investigative officials for the purpose of depriving Karen Silkwood and others of the equal protection and enjoyment of the laws of the United States." *Id.* at 745–46. The Tenth Circuit held that the complaint failed to state a cause of action under section 1985(3). Judge Logan wrote:

> The district court found the complaint lacking because the class-based animus was directed toward a group "which did not tend to exist prior to the occurrence of the events set forth in the complaint and which [tended] to be defined by one particular activity or by plaintiff's individual situation. . . ."

> \* \* \* \* \* \*

> To state a cause of action under section 1985(3) the law requires prejudice against a class *qua* class. Here it seems clear from the complaint as a whole that the feud, if there is one, is private; no general prejudice which transcends the immediate dispute is shown. Rather the hatred which defendants allegedly harbor is against Karen Silkwood and her associates arising out of the activities of the parties involved. . . . We hold this is essentially a private feud not within the intended scope of the Act's coverage. As was aptly stated by the district court, to hold otherwise would make § 1985(3) "applicable to all conspiratorial interferences with the rights of others, as there are no bounds upon the ingenuity of counsel in pleading novel and diverse classes to fit every conceivable situation."

*Id.,* 637 F.2d at 747–48 (citations omitted).

As in *Hughes* and *Silkwood,* Sellner does not assert any class-based, invidiously dis-criminatory animus and thus has not stated a cause of action under section 1985.

■ In *Silkwood,* Judge Logan also indicated, with regard to the claims against the FBI agents, that such agents could not have violated the civil rights of Silkwood since "the civil rights of a person cannot be violated once that person has died." 637 F.2d at 749 (and cases cited thereat). Further, Sellner seemingly may not complain of the deprivation, if any, of the constitutional rights of unrelated third persons. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 496, 499, 95 S.Ct. 2197, 2203, 2205, 45 L.Ed.2d 343 (1975) (Powell, J.) ("the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Thus, to the extent that Sellner claims that the civil rights of Martha Ann Hudnall have been violated, his allegations fail to state a claim upon which relief can be granted.

■ Finally, it may also be that Sellner's section 1985 claims fail because he has alleged the existence of conspiracies in only the most conclusory way and has not supported his allegations of conspiracy by reference to material facts. *See, e.g., Slotnick v. Staviskey,* 560 F.2d 31, 33 (1st Cir.1977) (Coffin, C.J.), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). However, even giving Sellner the benefit of the doubt and assuming *arguendo* only that he has sufficiently pleaded the existence of one or more conspiracies, it is still plain that he has failed to state a cause of action under section 1985 for the other reasons discussed *supra.*[8] *A fortiori,* Sellner fails to state a

---

**8.** It is also unnecessary herein for this Court to decide whether or not the types of conspiracy alleged by Sellner, which are unrelated to racial animus or to discrimination against any class of persons, sufficiently involve governmental, as contrasted with private, conspiratorial wrongdoing. *See Griffin,* 403 U.S. at 104–05, 91 S.Ct. at 1799; *Bellamy v. Mason's Stores, Inc. (Richmond),* 508 F.2d 504, 507 (4th Cir. 1974) (Craven, J.); *Gemini Enterprises, Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 567 (M.D.N.C.1979) (Gordon, C.J.); *accord, Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1193–95 (7th Cir.1976) (Fairchild, C.J.). *See, e.g., Doski v. M. Goldseker Co.,* 539 F.2d 1326, 1333–34 (4th Cir.1976) (Craven, J.). *Accord, Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 828–29 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976) (Stevens, J.); *Dombrowski v. Dowling,* 459 F.2d 190, 194–96 (7th Cir.1972) (Stevens, J.); *Scott v. Moore,* 680 F.2d 979, 988–

claim for relief under section 1986 [9] "since that section merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985." *Williams v. St. Joseph Hospital,* 629 F.2d at 452. *See also Hahn v. Sargent,* 523 F.2d at 469–70.

### CLAIMS UNDER 42 U.S.C. § 1983

■ Sellner claims against defendants under section 1983 only in *Marshall.* However, giving a liberal construction with an eye to Sellner's pro se advocacy, his complaint in *Panagoulis* will be considered herein as if he had stated a cause of action under section 1983. Section 1983, unlike section 1985, does not specifically refer to conspiracies. Nevertheless, an action for conspiracy can be maintained under section 1983. *See, e.g., Crowe v. Lucas,* 595 F.2d 985, 990 (5th Cir.1979) (Charles Clark, J.); *Slavin v. Curry,* 574 F.2d at 1261.

In *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), Justice Marshall wrote:

By the plain terms of § 1983, two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.

*Id.* at 640, 100 S.Ct. at 1923.

■ In *Panagoulis,* Sellner has not stated a cause of action under section 1983. Even assuming *arguendo* only that Sellner has alleged that defendants in that case deprived him of a federal constitutional or other lawful right,[10] Sellner has not alleged—and there is no indication—that any defendant in that case acted under color of state law in connection with any such deprivation. The only arguable element of such action is George Panagoulis's former position as Chief of Police of Prince George's County. However, by the allegations of Sellner's own complaint, Panagoulis retired as Chief of Police in July 1968, while Sellner did not even learn of the existence of the alleged cover-up and initiate his freelance investigation until January 1977. Thus, Panagoulis could not have harmed Sellner acting in his (Panagoulis's) official capacity.

In *Marshall,* Sellner does seemingly allege that defendants acted under color of state law. All defendants are sued in their official, as well as individual, capacities, and Sellner alleges that defendants failed or refused to take the action required of their office with regard to Sellner's allegations of wrongdoing in connection with the cover up of the murder of Martha Ann Hudnall or that defendants otherwise participated in some act of wrongdoing in their official capacities. Accordingly, this Court assumes herein that defendants in *Marshall* acted under color of state law. That leaves the question of whether any of the defendants in *Marshall* allegedly deprived Sellner of any of his federally-secured rights.

■ Sellner claims that defendant Marshall denied him (Sellner) access to the courts and that Marshall obstructed one or more grand juries by participating in the 1977 grand jury switch and by refusing to obtain documents or records, to summons witnesses or to provide those grand juries with an Assistant State's Attorney.

With regard to Sellner's claim of denial of access to the courts, Sellner's own allegations belie that contention. Marshall's December 2, 1980 letter to Sellner only indicated that Marshall had issued instructions

990 (5th Cir.1982) (en banc); *Action v. Gannon,* 450 F.2d 1227, 1233–37 (8th Cir.1971) (en banc).

**9.** § 1986. *Action for neglect to prevent*
Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission

of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .

**10.** *See* the discussion *infra* with regard to *Marshall.*

to *nolle prosse* any charging document that might be issued by a Commissioner upon Sellner's application. That letter shows that Marshall, as the prosecuting attorney for Prince George's County, had chosen, in the exercise of his prosecutorial discretion, not to act upon Sellner's allegations of wrongdoing in connection with the Martha Ann Hudnall murder case. The cases in which courts have found a denial of "access" are ones in which the potential litigant has sought or wishes to seek access to a court process, but has been met by a barrier at the threshold, *see, e.g., Boddie v. Connecticut,* 401 U.S. 371, 375–76, 91 S.Ct. 780, 784–785, 28 L.Ed.2d 113 (1971) (filing fees as assessed against indigent litigants); *McCray v. Maryland,* 456 F.2d 1, 6 (4th Cir.1972) (Sobeloff, J.) (negligence of clerk allegedly impeded filing of prisoner's petition for postconviction relief), or has been inhibited or deterred, directly or indirectly, from seeking redress of his grievance, *see, e.g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (insufficient legal research facilities afforded to incarcerated potential plaintiffs); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (rule prohibiting prisoners from helping other prisoners to prepare habeas corpus petitions). Sellner has not been denied access to the courts to seek redress of his grievances; he has only been frustrated in his attempts to persuade the appropriate Maryland authorities to investigate and prosecute Sellner's allegations of criminal wrongdoing. This Court does not know of any right afforded by either the Constitution or laws of the United States to private persons to compel a state to prosecute criminal activity. *Cf. United States v. Handler,* 383 F.Supp. 1267, 1269–72 (D.Md.1974).

Further, Sellner's own complaint indicates that he was afforded an opportunity to present his alleged evidence of criminal wrongdoing to an appropriate investigative and charging body of the State of the Maryland—*i.e.,* the grand jury. In *Brack v. Wells,* 184 Md. 86, 40 A.2d 319 (1944), the appellant had filed in the Baltimore City Court a petition for a writ of mandamus to compel the State's Attorney for Baltimore City to present evidence of alleged barratry and perjury to the grand jury of Baltimore City. The Court of Appeals of Maryland upheld the lower court's order refusing the writ on the ground, *inter alia,* that the appellant had another adequate remedy:

> That other adequate remedy to which the petitioner is entitled is that of personally presenting his case to the grand jury of Baltimore City.... The members of the grand jury in their oath prescribed by the common law, in addition to other things, swore that they would diligently inquire and true presentment make of all such matters and things as shall be given them in charge *or shall otherwise come to their knowledge.* The inquisitorial powers of the grand jury are not limited to cases in which there has been a preliminary proceeding before a magistrate nor to cases laid before them by the Court or the State's Attorney. Whatever may be the duties and powers of that important body in other jurisdictions, in Maryland those inquisitorial powers are broad, full and of a plenary character.... Under these broad inquisitorial powers the grand jury may, of course, investigate a case which the State's attorney, in his discretion, has decided not to present to that body....

*Id.* at 90–91, 40 A.2d 319 (emphasis in original).[11]

In *Marshall,* Sellner was able to present his evidence directly to the Prince

---

**11.** With regard to the plenary inquisitorial powers of the grand jury in Maryland, *see also Hitzelberger v. State,* 173 Md. 435, 440–41, 196 A. 288 (1938); *Coblentz v. State,* 164 Md. 558, 566, 166 A. 45 (1933); *In re Report of Grand Jury,* 152 Md. 616, 621–22, 137 A. 370 (1927). In *Brack* the appellee, the State's Attorney of Baltimore City, moved to modify the Court's opinion to strike out that portion of the opinion which stated that the appellant was entitled to present his case directly to the grand jury on the ground that such portion was unnecessary to the decision in the case and might overburden the grand juries. The Court refused to modify its decision and reaffirmed the plenary inquisitorial powers of the grand jury in Maryland. *Brack,* 184 Md. at 92–97, 40 A.2d 319.

George's County Grand Jury. Accordingly, Sellner was not denied "access" to the courts by Marshall's refusal to seek an indictment. However, Sellner also alleges that Marshall obstructed the grand jury and perhaps others by refusing to obtain documents or records, to summons witnesses or to provide the grand juries with an Assistant State's Attorney. Seemingly, however, since Marshall had determined that his office would not act upon Sellner's allegations, Marshall was under no duty so to attend upon the grand jury to aid it in its consideration of the evidence presented by Sellner. A State's Attorney "has the right to attend on the grand jurors with matters on which they are to pass, aid in the examination of witnesses, and give such general instructions as they may require." *State v. Aquilla,* 18 Md.App. 487, 494, 309 A.2d 44 (1973). Indeed, the State's Attorney may have a duty to attend upon the grand jurors with regard to matters brought before such grand jurors upon the initiative of such State's Attorney as the prosecuting officer. *Id.* at 493, 309 A.2d 44. However, there would seemingly be no such duty in cases in which the State's Attorney has determined, in the exercise of his prosecutorial discretion, not to pursue allegations of criminal wrongdoing. In Maryland, State's Attorneys are vested "with broad official discretion to institute and prosecute criminal causes." *Brack v. Wells,* 184 Md. at 90, 40 A.2d 319.[12]

In any event, however, Sellner would seemingly not have standing to complain of any obstruction of the grand jury because Marshall refused to assist the grand jury or because Marshall participated in the alleged 1977 grand jury switch. Such obstruction

might perhaps be punishable as a "contempt of the court to which the grand jurors have been summoned." *Hitzelberger v. State,* 173 Md. at 441, 196 A. 288. It may also be that the grand jurors themselves would have a cause of action against any person who attempted to interfere with the exercise of such grand jurors' duties. *Cf.* 42 U.S.C. § 1985(2). However, it would not seem that a self-appointed investigator like Sellner, as a private citizen, has any standing to complain of the obstruction of a grand jury by a prosecuting attorney.

Finally, and perhaps most important, even if Sellner had standing to complain of Marshall's actions with regard to the presentation of evidence to the grand juries or to the failure or refusal of Marshall to present evidence, it would appear that Marshall would be immune from all damage claims asserted by Sellner against him under section 1983. *See Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).[13]

▮▮▮▮ Sellner alleges that Hogan failed or refused to take proper executive action with regard to Sellner's allegations of criminal wrongdoing in connection with the Martha Ann Hudnall murder case. The County Executive of Prince George's County, however, has no power or authority to prosecute crime. *See* Prince George's County Charter § 402. In Maryland, the State's Attorneys are vested with the responsibility for prosecuting criminal cases at the trial level. *See State v. Aquilla,* 18 Md.App. at 493, 309 A.2d 44; *State v. Hunter,* 10 Md.App. 300, 305–07 n. 5, 270 A.2d 343 (1970). Further, this Court knows of no federally-secured right of Sellner upon

---

**12.** It is to be noted that Marshall has submitted an affidavit which states that he (Marshall) did advise the foreman of at least one grand jury that since the Office of the State's Attorney for Prince George's County would not have a representative present during Sellner's presentation, the foreman might wish to seek legal assistance from the Office of the Attorney General for the State of Maryland or the Office of the State Prosecutor. Thus, it would seem that Marshall did not leave that grand jury completely without means of seeking guidance. However, even if Marshall, in his discretion, did

simply decline to have a representative present during Sellner's presentation of evidence to one or more grand juries, Sellner has not stated a § 1983 case against Marshall because of such action on the latter's part.

**13.** *See also Vinson v. Richmond Police Department,* 567 F.2d 263, 265 (4th Cir.1977), *vacated and remanded on other grounds,* 438 U.S. 903, 98 S.Ct. 3120, 57 L.Ed.2d 1145 (1978); *Weathers v. Ebert,* 505 F.2d 514, 515 (4th Cir.1974); *McCray v. Maryland,* 456 F.2d at 3.

which Hogan has even arguably infringed. Accordingly, Sellner has not stated a cause of action under section 1983 against Hogan.

 Sellner alleges that McHale, Rhoads and Vasco failed or refused, as members of the Department, to take appropriate police action with regard to Sellner's allegations of wrongdoing in connection with the unsolved murder of Martha Ann Hudnall and the subsequent cover-up of the identity of the murderer. Sellner also claims that McHale refused to act on several complaints regarding police practices filed by Sellner with the Internal Affairs Section of the Department, that Rhoads was the owner of the getaway car used by James Panagoulis after the 1968 murder of Martha Ann Hudnall, and that Vasco participated in the 1977 grand jury switch. Even assuming *arguendo* only that, as Sellner contends, those defendants failed or refused to take action with regard to Sellner's said allegations, that failure or refusal, if actionable at all, does not rise to the level of a deprivation of Sellner's constitutional or other federal rights. A similar conclusion is reached with regard to Sellner's allegation that McHale refused to act on complaints filed by Sellner with the Department. While, if true, the fact that Rhoads was the owner of the getaway car used by James Panagoulis might give rise to criminal liability on the part of Rhoads, it does not give rise to any cause of action on Sellner's part. Finally, for the reasons stated *supra* in connection with Sellner's allegations against Marshall, while Vasco's alleged attempts to deceive the grand jury in 1977 might be punishable as contempt of court, Sellner has no standing to complain of the 1977 grand jury switch. Accordingly, Sellner has failed to state a cause of action under section 1983 against McHale, Rhoads or Vasco.

 With regard to Ross, Sellner alleged that Ross participated in the 1977 grand jury switch. With regard to McComas, Sellner alleges that McComas assisted Ross and Vasco in the 1977 grand jury switch. Those allegations fail to state a cause of action on Sellner's part. Sellner also claims that McComas "systematically conducted a campaign to assassinate the character of" Sellner by subjecting Sellner to "intensive investigation by . . . [various] law enforcement agencies." McComas has submitted an affidavit which states "that during the years 1977, 1978, and 1979, . . . [he] was requested by various federal, state, and local law enforcement agencies to make available the results of . . . an investigation, contained in a case work-product file, regarding the criminal allegations by Mr. Sellner," and that, to the best of McComas's knowledge, "all requests for information from other law enforcement agencies resulted from complaints made to those agencies by Mr. Sellner, himself." Thus, it may be that on the merits Sellner may not prevail. In any event, however, giving to Sellner all inferences running in his favor in the summary judgment context of this case, Sellner's complaint at best alleges that McComas defamed him. Injury to reputation alone is not a constitutionally protected interest. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

With regard to Prince George's County, even if Sellner's allegations are sufficient under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that County has not violated any one or more of Sellner's federally protected constitutional or other lawful rights unless one or more of its officials or others in its employ did so, and none of them has done so. Since Sellner has failed to state a cause of action under section 1983 against any other defendant in the *Marshall* case, he fails to state a cause of action against the County.

For all of the foregoing reasons, Sellner fails to state a claim upon which relief can be granted under section 1983 in either the *Panagoulis* or *Marshall* cases.

### DIVERSITY OR PENDENT JURISDICTION

 Even if Sellner's allegations herein stated a cause of action under Maryland law, the record in both cases demonstrates that Sellner and all defendants are

citizens of the State of Maryland. Accordingly, subject matter jurisdiction is not present by way of diversity. As to pendent jurisdiction, this Court declines to exercise it in the absence of diversity or federal question jurisdiction herein. *See Hector v. Weglein,* 558 F.Supp. 194 (D.Md.1982).

## CONCLUSION

For the reasons stated in this opinion, summary judgments will be entered in favor of all defendants in these cases with regard to all of Sellner's complaints.[14]

---

**14.** There remain outstanding Sellner's motion to enjoin defendant Ross (police major) filed in *Marshall,* a motion to adjudicate plaintiff in contempt filed by certain defendants in *Panagoulis,* plaintiff's motion to consolidate these two cases and a third case Sellner has instituted in this Court, and issues relating to attorneys' fees and court costs.

With regard to Sellner's motion relating to defendant Ross, it appears that Sellner, alleging that Ross harassed Sellner at the Lodge of the Fraternal Order of Police, seeks to enjoin Ross from communicating with Sellner except through counsel and from interfering with Sellner's activities. With regard to the motion to adjudicate Sellner in contempt, it appears that despite this Court's order staying discovery

pending the issuance of the within opinion, Sellner has mailed interrogatories directly to certain defendants in *Panagoulis.* There would appear no need for this Court to take any action in connection with those two motions in view of the determination made in this opinion. As to the consolidation motion, the *Panagoulis* and *Marshall* cases are dealt with and finally determined in this one opinion. The third case instituted lately by Sellner is not yet ripe for decision and will not be considered with *Panagoulis* and/or *Marshall.* As to attorneys' fees and court costs in the within two cases, if defendants desire to pursue their guests for the same, they should so notify this Court, in writing, on or before January 17, 1983; otherwise, those quests will be deemed abandoned.