Carol Elaine WILLIAMS, by her mother
and next friend, Marcia Williams et
al., Plaintiffs-Appellants,

v.

ST. JOSEPH HOSPITAL et al.,
Defendants-Appellees.

No. 79–1204.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1979.

Decided July 15, 1980.

Edward T. Butt, Jr., D. Kendall Griffith, Karla Wright, Harvey B. Bass, Terrence J. Madden, Robert Marc Chemers, Joseph B. Lederleitner, Norman J. Lerum, II, Harold L. Jacobson, Chicago, Ill., Thomas Feehan, Joliet, Ill., for defendants-appellees.

**450**

Martha A. Mills, Chicago, Ill., for plaintiffs-appellants.

Before FAIRCHILD, Chief Judge, CUDAHY, Circuit Judge, and DUMBAULD, Senior District Judge.*

DUMBAULD, Senior District Judge.

One of the paradoxical aspects of this interesting case is that patients whose low opinion of the professional skill of their physicians impelled them to institute lawsuits for malpractice[1] now seek in the case at bar *inter alia* to require those physicians to continue to provide medical care for the plaintiff patients.

It might be against public policy, as involving something akin to a conflict of interests, to compel a physician to continue to serve a patient who has filed a malpractice suit against him. However, plaintiffs-appellants here allege (and for the purposes of a motion to dismiss we must accept as true) the existence of a broader conspiracy among *all* the doctors in Joliet, Illinois, to refuse to treat any person (or that person's family) who has instituted a malpractice suit against *any* doctor in Joliet, Illinois, in any state or federal court.

Plaintiffs are Marcia Williams and her child, and Sandra Young and her four children. They allege that they bring this action on behalf of all persons who have filed or may file a medical malpractice suit against any doctor in or around Joliet, Illinois, and that the class is numerous. Sandra Young and Marcia Williams aver that they each filed malpractice actions against those defendants whose patients they have been; that they each were notified of refusal to treat them in the future; and that they had sought to be accepted as patients by other doctors but had been refused.

Plaintiffs state, on information and belief, that all the doctors in Joliet have combined to refuse to treat any person, or family, who has brought a malpractice action against any Joliet doctor.

Other than the class action averment of numerosity, plaintiffs do not allege the size of the group refused treatment. They do allege that the medical practices of defendants affect interstate commerce; that defendants purchase much of their supplies from out of state; that they are members of national associations and governed by their policies; and that they treat welfare and medicare patients and receive payment through the mails, interstate.

■ The complaint alleges: (I) violation of plaintiffs' civil rights under 42 U.S.C. § 1985; (II) violation of 42 U.S.C. § 1986 by a defendant hospital; (III) violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1[2]; (IV) violation of the Illinois Antitrust Act, 38 Ill.Rev.Stat. Sec. 60–3(2); (V) intentional infliction of severe mental and emotional stress in violation of Illinois law; (VI) conspiracy to boycott, in violation of Illinois law; (VII) malicious interference with contracts, in violation of Illinois law.

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. Plaintiffs' malpractice suits were filed in Illinois state courts, not federal courts. Hence appellants are not benefited even if the right of access to federal courts is a civil right appurtenant to United States citizenship. See *Mulherin v. O'Brien*, 588 F.2d 853, 856 (C.A.1, 1978).

2. Although not mentioned in the complaint, appellants also invoke and the District Court discusses the triple damage provisions of the Clayton Act, 15 U.S.C. § 15, which is an appropriate manner for private parties to obtain relief for violations of the Sherman Act. 15 U.S.C. § 15 provides that "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit including a reasonable attorney's fee." That consumers, such as appellants, may invoke 15 U.S.C. § 15 was held in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). On appeal we apply the law as it now stands. *The Peggy*, 1 Cranch 103, 110, 2 L.Ed. 49 (1801). The District Court's contrary construction of the language of the Clayton Act is harmless error, being merely an alternative ground for dismissal of Count III. Moreover, the effect of appellees' acts is not to require appellants to pay a higher price for medical services but to deprive them of services, thus augmenting rather than diminishing appellants' "property."

■ The civil rights statute invoked in Count I, 42 U.S.C. § 1985,[3] is derived from the old Nightriders or Ku Klux Act discussed in *U. S. v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1875). The section is applicable only where there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971).

The first subsection of Sec. 1985 expressly requires "force, intimidation, or threat" and is directed against preventing officials from doing their duty. This provision is obviously inapplicable to the case at bar.[4]

The same is true of the first part of subsection (2) of Sec. 1985, which relates to deterring a witness or party from attending court, or testifying truthfully, or influencing a juror, in any United States court. Here, too, "force, intimidation or threat" is requisite, and the provision is obviously inapplicable to the case at bar.

However, subsection (2) of Sec. 1985 contains two parts, separated by a semicolon. The second part is more general in its terms, and relates to obstructing "in any manner" the due course of justice "in any State or Territory." (Perhaps this part of the subsection is intended to apply only to state or territorial courts, rather than to courts "of the United States.")

■ But such obstruction of justice must be undertaken "with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." As explained in *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971): "The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminating animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." Hence plaintiffs have not established a cause of action under the second part of Sec. 1985(2), as construed by the Supreme Court.

■ Similar reasoning precludes the existence of a cause of action under Sec. 1985(3). That subsection reaches "two or more persons . . . [who] conspire or go in disguise on the highway . . . , for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." But as clearly explained in the acute analysis set forth by Judge (now Mr. Justice) John Paul Stevens, speaking for this Court in *Dombrowski v. Dowling*, 459 F.2d 190, 194–96 (C.A.7, 1972); and *Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 828–29 (C.A.7, 1975), an equal protection claim of this character is one species of a claim alleging violation of the Fourteenth Amendment, and hence like all Fourteenth Amendment claims requires State action. This principle was reaffirmed by this Court

**3.** An overt act "whereby another is injured in person or property, or deprived of having and exercising any right or privilege of a citizen of the United States" is required to make any Sec. 1985 conspiracy actionable. Sec. 1985(3).

**4.** 42 U.S.C. § 1985(2) reads as follows:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

in a subsequent case, *Murphy v. Mt. Carmel High School*, 543 F.2d 1189, 1193 (1976).

■ Hence it follows that the complaint in the case at bar sets forth no cause of action under Sec. 1985. It is equally clear that appellants have no cause of action under 42 U.S.C. § 1986, since that section merely gives a remedy for misprision of a violation of 42 U.S.C. § 1985.

We turn now to appellants' most plausible foundation for a cause of action—the antitrust laws. The economic philosophy and legal technique underlying these basic American institutions are well described by the late Mr. Justice Hugo Black in *Northern Pac. R. Co. v. U. S.*, 356 U.S. 1, 4–5, 78 S.Ct. 514, 517–518, 2 L.Ed.2d 545 (1958):

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition, and to this end it prohibits "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, [31 S.Ct. 502, 55 L.Ed. 619]; *Chicago Board of Trade v. United States*, 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683].

> However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.*, [6 Cir.], 85 F. 271, [46 L.R.A. 122], aff'd 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators Guild of America v. Federal Trade Comm'n*, 312 U.S. 457, [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].

In the *Fashion Originators' Guild* case, cited in the above extract, the Court condemned a "private government" set up by textile and garment manufacturers to curtail style and design piracy by forbidding sales by members of the group to purchasers handling pirated products. The scheme violated the policy of the Sherman Act by narrowing "the outlets to which garment and textile manufactures can sell and the sources from which retailers can buy" as well as subjecting those "who decline to comply with the Guild's program to an organized boycott." 312 U.S. at 465, 61 S.Ct. at 707.

And in *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 210, 212–13, 79 S.Ct. 705, 708, 709–710, 3 L.Ed.2d 741 (1959), it was held to be unlawful for a group of manufacturers of electrical appliances to refuse to sell (except upon unfavorable terms, impairing his competitive

ability) to a single merchant, even if the very articles involved in the refusal were available to the public from competing retailers within a few blocks away from the disadvantaged merchant's place of business. Group boycotts such as this, the Court held, fell within the category of *per se* violations. *Ibid.*, at 212, 79 S.Ct. at 709.

This is true, even if a single seller is free to deal with whom he will, and upon whatever terms he sees fit. *U. S. v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).[5]

■ The preceding authorities, as well as *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 235–36, 68 S.Ct. 996, 1005–1006, 92 L.Ed. 1328 (1948), show that a restraint of trade is equally objectionable, whether it operates against buyers or sellers.[6]

■ It follows, therefore, in the case at bar that precluding appellants from a free market for the *purchase* of medical care violates the antitrust laws just as much as would a restriction prescribing the terms upon which a doctor was free to *sell* his services. (In fact, the alleged agreement or combination here also restricted the freedom of doctors to furnish service to

appellants, as well as the freedom of appellants to receive service.[7])

■ We are satisfied also that professional services are subject to the antitrust laws. Though the Supreme Court avoided that question in *American Medical Assn. v. U. S.*, 317 U.S. 519, 528, 63 S.Ct. 326, 328, 87 L.Ed. 434 (1943), later cases indicate plainly that with regard to its economic aspects professional activity is subject to the policies of the antitrust laws.[8] *Goldfarb v. Va. State Bar*, 421 U.S. 773, 786–88, 95 S.Ct. 2004, 2012–13, 44 L.Ed.2d 572 (1975); [9] *Bates v. State Bar of Arizona*, 433 U.S. 350, 356, 363, 368–72, 97 S.Ct. 2691, 2695, 2698, 2701–2703, 53 L.Ed.2d 810 (1977).[10]

It remains to consider whether the activities alleged, being local in nature,[11] substantially and adversely affect interstate commerce. 421 U.S. at 785, 95 S.Ct. at 2012. See also *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974).

■ The "diminished assets" theory of effect on interstate commerce applies in antitrust cases, as well as in cases involving other types of obstruction to interstate commerce.[12] *Hospital Building Co. v. Rex*

---

5. The vitality of *Colgate* persists notwithstanding the condemnation of "unilateral action, plus" in *U. S. v. Parke, Davis & Co.*, 362 U.S. 29, 44–45, 80 S.Ct. 503, 511–512, 4 L.Ed.2d 505 (1969).

6. In economist's jargon, monopsony is as evil as monopoly.

7. Of course an individual doctor could unilaterally establish his own individual policy to eschew dealing with troublesome patients, under *Colgate*. But the complaint alleges a conspiracy or group boycott, and whether it can be proved or not is a matter to be determined at trial rather than on a motion to dismiss. *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746–47, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

8. The learned professions do not fall within the scope of 15 U.S.C. § 17, in spite of its general declaration that "The labor of a human being is not a commodity or article of commerce." The rule *noscitur a sociis* limits that language to conventional labor unions. Even unions are liable under the antitrust laws when they combine with non-union groups. *Allen-Bradley Co.*

*v. Local 3*, 325 U.S. 797, 810–11, 65 S.Ct. 1533, 1540, 89 L.Ed. 1939 (1945).

9. See also *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 766–70, 96 S.Ct. 1817, 1828, 48 L.Ed.2d 346 (1976).

10. In *Bates* the Court held that the State action exception of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), was applicable. This affirms as a negative pregnant the general applicability of the antitrust laws to the economic aspects of legal services where State action is not involved.

11. As stated by Mr. Justice Jackson in *U. S. v. Women's Sportwear Assn.*, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805. "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

12. For recognition of this type of harmful effect upon interstate commerce in cases not arising under the Sherman Act, see *Heart of Atlanta Motel v. U. S.*, 379 U.S. 241, 257, 273–74, 85

*Hospital Trustees*, 425 U.S. 738, 744–45, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976); *Burke v. Ford*, 389 U.S. 320, 321–22, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967); *U. S. v. Finis P. Ernest, Inc.*, 509 F.2d 1256, 1261 (C.A.7, 1975); *Doctors, Inc. v. Blue Cross*, 490 F.2d 48, 51–53 (C.A.3, 1973).

Appellants have alleged that the conspiracy complained of restrains interstate commerce, and should be given the opportunity to prove their allegations if they can. *White Motor Co. v. U. S.*, 372 U.S. 253, 259, 264, 83 S.Ct. 696, 699, 702, 9 L.Ed.2d 738 (1973); *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

 It is true that medical practice *per se* and without more is a local activity. To bring it within reach of the antitrust laws a substantial and adverse effect upon interstate commerce is requisite. *Polhemus v. Am. Medical Assn.*, 145 F.2d 357, 359 (C.A.10, 1944). What impact defendants' professional activities may have upon interstate commerce in medical supplies and the like is a question of fact not susceptible of determination without scrutiny of such proof as may be offered. The impact may be *de minimis*; but on the other hand it may well be that appellants can "demonstrate a substantial effect on interstate commerce" as a matter of practical economics. *McLain v. Real Estate Board*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980).

 Accordingly appellants must be given the opportunity to prove their allegations. Since further proceedings in the District Court will be required, the discretionary issue [*United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)] with respect to the pendent claims under State law should be held

open for re-examination by the District Court in the light of the facts developed subsequently. It may be that these claims will demonstrate a case *par excellence* under State law, which should be handled by the State courts; on the other hand, circumstances might indicate that convenience in administration of justice would be promoted by disposing of all cognate issues upon a single record. The District Court's discretion with respect to these claims should be exercised anew after the facts have been fully developed. There was no abuse of discretion in requiring plaintiffs to pay for transcribing depositions which they initiated.

Reversed and remanded.

FAIRCHILD, Chief Judge, dissenting in part.

I agree with the opinion, except for the portion in which the court discusses the trial court's ruling that plaintiffs must pay for transcription of certain depositions.

Plaintiffs noticed the deposition of all defendants, over fifty in number. Six physician defendants were actually deposed and those defendants requested transcripts of their depositions at plaintiffs' expense. Pursuant to Local Rule 18,[1] plaintiffs moved the court to order defendants to pay for the cost of transcription; plaintiffs suggested that they had no need for these transcripts and claimed that they could not afford the cost of transcription. The trial court denied plaintiffs' motion, which denial is challenged as an abuse of discretion.

Federal Rule of Civil Procedure 30 does not require the transcription of all depositions nor specify which party shall pay for a deposition which is requested to be transcribed.[2] It is a general rule that the party

---

S.Ct. 348, 357, 366, 13 L.Ed.2d 258 (1964); *U. S. v. Mazzei*, 521 F.2d 639 (C.A.3, 1975); *U. S. v. Long*, 534 F.2d 1097, 1099 (C.A.3, 1976); *U. S. v. DeMet*, 486 F.2d 816, 821–22 (C.A.7, 1973); *U. S. v. Braasch*, 505 F.2d 139, 147 (C.A.7, 1974).

**1.** United States District Court, Northern District of Illinois, Rule 18 reads, in pertinent part: "(b) The party taking the deposition shall as-

sume the cost of the transcription unless, upon consent of the parties, the court permits such transcription to be waived or orders a different apportionment of cost for good cause shown."

**2.** Rule 30(c) provides in part that "[i]f requested by one of the parties, the testimony shall be transcribed." This language was adopted in 1970, replacing the rule that "testimony *shall* be . . . transcribed unless the parties

noticing a deposition pays for the costs necessarily incurred as a result of the deposition such as transportation costs, stenographic reporter's fees, and payments to expert witnesses. In the normal course of events, a party noticing a deposition will cause it to be transcribed at his expense; any party or a deponent may then obtain a copy at his own expense. The issue before us arises because the cost of original transcription is significantly greater than the cost of producing a copy of a deposition which has already been transcribed.

We do not find any case construing Local Rule 18, but do note four decisions of district courts discussing this aspect of FRCP 30 prior to the 1970 amendments. In each of those cases, the party noticing the deposition had decided it did not wish to have it transcribed but the opposing party did. The court in *Odum v. Willard Stores, Inc.*, 1 F.R.D. 680 (D.D.C.1941) ruled that, in the absence of unusual circumstances, the party noticing a deposition is not required to have it transcribed and that an opposing party wishing a transcription should pay for it when the noticing party does not want the deposition to be transcribed. In *Burke v. Central-Illinois Securities Corp.*, 9 F.R.D. 426 (D.Del.1949), the court required the noticing party to pay the cost of transcription and to file the transcript with the court; the opposing party could then get a copy of the transcript at its expense. *Dall v. Pearson*, 34 F.R.D. 511 (D.D.C.1963) represents a third view. In *Dall,* the court held that the matter was within the court's discretion to determine but that under the facts of the case the noticing party had to bear the cost of transcription. The court in *Kolosci v. Lindquist,* 47 F.R.D. 319 (N.D.Ind.1969) decided that "the person initiating the taking of the deposition should pay for its transcription and filing . . . [Except] in extraordinary cases. Then, and only then, should the court exercise its discretion." *Id.* at 321. Such exceptional circumstances

would include instances in which the discovery process had been abused by the party not taking the deposition, or the deposition had turned out to be of no value to any party. *Id.*

I think that, in light of the change made in the Federal Rules in 1970, the district court should have discretion in deciding which party should bear the cost of transcription when the noticing party does not wish to have a deposition transcribed, but that such discretion should not be applied as restrictively as suggested in *Kolosci.* One commentator has suggested "that the party initiating the deposition has no funds with which to pay for transcription and does not desire a transcript would seem to be a good reason to put the financial burden on the party requesting the transcript." *C. Wright & A. Miller, Federal Practice and Procedure,* § 2117 (1970). This application of the court's discretion would prevent parties from discouraging their opponents' use of depositions for discovery by making that use prohibitively expensive; preventing such a result is especially important in cases like the one before us in which the noticing party is allegedly without great financial resources. This result would also conform to what I assume is common practice in the courts. I find no defect in Local Rule 18 because it does properly assume that in most cases the cost of transcription of depositions will be borne by the party taking the deposition and that the court may alter that normal rule for good cause. I would find that the district court failed to consider whether the circumstances present here constituted good cause under Local Rule 18 to shift the cost of transcription of depositions to the defendants who had requested the transcripts.

---

agree otherwise." (Emphasis added). The change was explained in the committee note as follows:

> The present rule provides that transcription shall be carried out unless all parties waive it. In view of the many depositions taken

from which nothing useful is discovered, the revised language provides that transcription is to be performed if any party requests it. The fact of the request is relevant to the exercise of the court's discretion in determining who shall pay for the transcription.