**Jerry Lee BUSH, Plaintiff,**

v.

**Jackie WARE, Michael Hafeman, et al., Defendants.**

**No. 81–C–0620.**

United States District Court, E.D. Wisconsin.

June 19, 1984.

F. Thomas Olson, Chane, Glassner, Tehan, Clancy & Taitelman, Milwaukee, Wis., for plaintiff.

Terence P. Cahill, Asst. Corp. Counsel, Waukesha, Wis., for defendants.

## ORDER

WARREN, District Judge.

This action arises out of an incident, or series of incidents, that occurred at the Waukesha, Wisconsin, County Jail on April 5, 1980. The plaintiff, who was then an inmate at the jail awaiting sentencing for offenses of which he had been convicted several days earlier in a state court, alleges that he was beaten by three of the individual defendants. He also avers that the beating was administered with the knowledge, or at the direction, of the other defendants, pursuant to a policy, custom, or usage of the defendant Waukesha County and its agents and officers. He seeks compensatory and punitive damages under 42 U.S.C. §§ 1983, 1985, and 1986, both for the injuries that he asserts he sustained during the beating and for what he contends was the defendants' failure or refusal to provide follow-up medical care after April 5, 1980.

The case was tried to the Court over a period of three days. A total of 14 witnesses were called to testify, including the plaintiff and four of the individual defendants, and the depositions of the two remaining individual defendants were offered and made part of the record in their entirety. In addition, 53 exhibits were received in evidence. Following the trial, the parties submitted proposed findings of fact and conclusions of law. The Court, having considered the evidence and the submissions of the parties, now renders its decision. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this decision is intended to be the Court's findings of ultimate fact and conclusions of law.

## I. THE INCIDENT

The plaintiff is Jerry Lee Bush who, at the time of trial, was 24 years of age and an inmate at the Waupun Correctional Institution in Waupun, Wisconsin. From January 1980 to April 9, 1980, however, he was confined in the Waukesha County Jail in Waukesha.

On April 5, 1980, the defendants Jackie Ware, Michael Hafeman, and Michael Goodyear were corrections officers at the Waukesha County Jail. As such, they were employed by the defendant Waukesha County and assigned to the sheriff's department, which operated the jail. On April 5, 1980, the defendant Michael Goodyear was a CO [Corrections Officer] II—a supervisory position—and the defendants Ware and Hafeman both held the lower rank of CO I.

On the date of the incident at issue here, the defendant Raymond Klink was the sheriff of Waukesha County. As sheriff, he was the county's chief law enforcement officer and his responsibilities included overseeing the operations of the Waukesha County Jail. Lawrence Lynch, another of the defendants, was an administrative lieutenant with the sheriff's department. He was responsible for overall jail operations and reported to the sheriff, although it was the jail administrator, immediately below Lt. Lynch in the hierarchy, who had charge of the day-to-day operations of the jail. On April 5, 1980, the defendant Robert Gaieck was the administrator.

The Waukesha County Jail is located in a three-story wing of the Waukesha County Courthouse. In April of 1980, it was a maximum-security facility, used for sentenced and unsentenced male and female felons and misdemeanants, both adult and

juvenile. The jail offices and the prisoner intake area were located on the ground floor, and the inmates were housed in cellblocks on the two floors above.

On April 4, 1980, Waukesha County Correctional Officer Steven Leonhardt received information from a jail trusty, Timothy Shattuck, which led him to believe that inmates in the jail might be planning a jail break attempt. Shattuck told Leonhardt that the plaintiff had asked him to inform a prisoner in the federal cell block (Block 3) that Bush "would get it down to him but the heat was on." Defendant Ware testified that when he was called in for overtime on April 5, 1980, Officer Leonhardt told him that a "shakedown" of the jail would be conducted because it was suspected that prisoners might have a gun and other items for a possible break-out.

On the morning of April 5, 1980, the plaintiff was in a cell in Block 10 of the jail. At approximately 5:30 A.M. the inmates were awakened by officers who stated that the plumbing was out of order and that the inmates would be required to stay and eat in their cells until the plumbing was repaired. The plumbing was turned off in the blocks which were going to be searched to prevent contraband from being flushed down the toilets. A shakedown of the jail began at approximately 8:00 A.M.

The shakedown was conducted by 11 to 13 officers under the direction of CO II Steven Leonhardt. Although some of the officers present and involved in the shakedown normally worked the shifts during which the shakedown was conducted, others, like the defendants Ware and Goodyear, were either called in specially or stayed beyond the end of their regular shifts. As the shakedown proceeded, each inmate was separately taken from his cell to the shower walkway area at the end of the block and subjected to a strip search in which he removed his clothes and in which both his clothes and body cavities were searched for contraband. Following the strip search, each inmate was taken from Block 10 and removed temporarily to another part of the floor. The plaintiff was the last of the inmates to be taken from his cell and strip-searched.

When the strip searches were completed, the inmates of Block 10 were singly returned to the block and told to remain in the day area immediately outside their cells so that they could observe while the interiors of the cells were searched. Again, the plaintiff was the last of the inmates to be returned to the block. The plaintiff testified that, when he was returned to stand in front of his cell, he believed the cell already had been searched by one or more officers because he noticed a shoeprint on the sheet of his bunk and because inmates were not permitted to wear shoes in the block.

Officers Leonhardt, Goodyear and Ware each testified that contraband was found in the plaintiff's cell. All three recalled that the items found were an allen wrench, a wire file, and eleven dollars in cash. There was testimony that the allen wrench was capable of opening the control panels which operate the cell and block doors. The items were found in a sock hidden behind a toilet. The testimony also demonstrated that the items found in the plaintiff's cell represented only a small portion of the total contraband seized during the shakedown. Thus, the plaintiff was not the only inmate who was found to possess contraband. No gun was found in any of the cell blocks.

After the search, the plaintiff was informed that contraband had been found in his cell. Plaintiff testified that the contraband was not shown to him, although Officer Leonhardt's testimony contradicted this. In any event, Officer Leonhardt ordered that plaintiff be placed in "the hole." This was the commonly used term for Block 8 which was used for administrative segregation. Plaintiff was the only inmate ordered into segregation as a result of the shakedown.

When the order was given by Officer Leonhardt to take the plaintiff to Block 8, several of the group of officers assisting with the shakedown in Block 10 halfpushed and half-carried the plaintiff out of the block. When the plaintiff and the officers reached the door to Cell 1 in Block 8 the plaintiff resisted, loudly protesting that

he was being treated unfairly, that no charges had been brought against him, and that no disciplinary hearing had been held as a condition to his being confined to the hole. The officers were nonetheless able to push the plaintiff into the cell and the door was closed.

The jail then had a procedure by which an inmate was entitled to a prior hearing to determine if "good cause" existed for placing him in administrative segregation. No disciplinary hearing was ever initiated against the plaintiff relating to the contraband found on April 5, although the jail's disciplinary process included "possession of significant contraband" as one of the reasons for referring an inmate to the disciplinary board. The disciplinary process also permitted disciplinary segregation *prior* to hearing, but only if "the general security of the institution is immediately threatened."

Cell 1 in Block 8, into which the plaintiff had been placed after he was removed from Block 10, was approximately 5 by 9 feet in size. It had two solid metal walls on the sides and a solid concrete wall at the back. The front of the cell, in which the door was located, was barred. The cell had a small sink and commode at the rear, a metal cot without a mattress on one side and a small metal table toward the front. Both the cot and the table were bolted to the floor or walls.

Shortly after he was placed in the cell, the plaintiff shouted to a prisoner in a nearby cell to throw him a towel. The plaintiff then placed something inside the towel and began to swing the towel, striking the walls and bars of the cell. There is conflicting testimony on what was in the towel. The plaintiff testified that he found a metal elbow joint when he entered the segregation cell and this is what he placed in the towel. Various defense witnesses testified that after the incident was over, they found that the towel contained both the metal elbow joint and a sharp piece of procelain.

While swinging the towel, plaintiff continued to complain that he had been wrongfully placed in the hole and he demanded to

see the jail administrator, defendant Robert Gaieck. Officers Goodyear and Ware both testified that the plaintiff was also shouting threats at various guards.

Officer Ware contacted jail administrator Gaieck and informed him of the situation. Gaieck instructed Ware to talk to the plaintiff. Ware testified that he spoke to the plaintiff for several minutes in an effort to get the plaintiff to give up what Ware described as a "weapon." Ware said at the trial that he then believed the towel contained a metal object that made noise when it struck the walls or something else. While he spoke to the plaintiff, the plaintiff ceased swinging the towel. However, the plaintiff refused to give up the towel and reiterated a demand that he be permitted to speak to Mr. Gaieck about his grievance. Ware told the plaintiff that if he did not give up the weapon, officers would have to enter the cell and take it from him.

After Ware was unsuccessful in persuading the plaintiff to give up the towel and its contents, defendant Goodyear, went into the block to talk to the plaintiff. (Goodyear had, when news of a commotion in the block reached the first-floor office where he was then writing reports, been told initially by Gaieck to go up and assess the situation. Before he went upstairs, however, he received a message that the plaintiff had a "weapon." He then returned for a further conversation with Gaieck, who told him to retrieve the weapon. It was Goodyear's understanding that he was then to use the minimum force necessary to subdue Bush. It was then that he summoned Ware and Hafeman to go with him and he waited outside the block while Ware first talked to the plaintiff.)

As with Ware, while Goodyear talked with the plaintiff he did not swing the towel. The plaintiff, who was quite agitated, continued to refuse to give up the towel and the object it contained. (Like Ware, Goodyear was not certain what the object was but he believed from looking at the sink that it might be a sink fitting.) Meanwhile, Ware returned to the first floor where he was told by Gaieck that he and

the other officers were to do whatever was necessary to retrieve the towel and the object it contained, so long as none of the guards got hurt. Ware then returned to the block.

When Goodyear had summoned Hafeman to come to Block 8 with him, Hafeman had hastily opened a drawer in the desk at which he was working and removed a set of ankle restraints and took them with him to the block. Ware was carrying a long, six-celled flashlight with him when he returned to the block; he testified that, although the shakedown for which he had originally been using the flashlight had been completed, the flashlight belonged to another officer and he continued to carry it because he was afraid of losing it. Upon his return to Block 8, Ware told Goodyear and Hafeman what Gaieck had instructed him to do.

Ware, Hafeman, and Goodyear then settled upon a plan for rushing into the plaintiff's cell, subduing the plaintiff, and retrieving the towel and the object it contained. Although the officers' testimony at trial about the precise details of the plan conflicted in several respects, they all testified that (1) at a signal, a fourth officer, James Lambert, was to throw a switch near the entrance to the block that would automatically open the plaintiff's cell door, and (2) Ware was to lead the group into the cell. The crucial testimony regarding the guards' entry into the cell and their subduing of the plaintiff was, not surprisingly, conflicting. The Court finds that the credible evidence reveals the following sequence of events.

At or about the time the door was opened, the plaintiff threw one or two small milk cartons of liquid at the assembled officers. They believed the liquid was urine. Both Goodyear and Hafeman were struck by the liquid.

Thereafter, the three guards entered the cell with Ware in the lead. Ware carried the six-celled flashlight by the large end and Hafeman carried the ankle restraints. Ware rushed forward first and began hitting Bush with the flashlight. The three officers all joined in attempting to subdue the plaintiff. Goodyear was struck in the face by the towel the plaintiff was swinging and received a small cut. Ware struck the plaintiff on the head with the heavy flashlight at least three times by his own admission. The plaintiff put his hands over his head to ward off the blows from the flashlight. Hafeman attempted to pin the plaintiff's lower body and was kicked in the stomach or abdomen. He struck the plaintiff with the ankle restraints. The plaintiff testified that Goodyear did not strike him and, indeed, that Goodyear tried to restrain Ware saying, "You're gonna kill him." Goodyear denies this statement.

## II. THE PLAINTIFF'S INJURIES

After the brief struggle had ended, the plaintiff was bleeding profusely. The sheriff's department paramedics were called and the plaintiff was taken to Waukesha Memorial Hospital where he was treated as an outpatient in the emergency room for lacerations to his head and a comminuted fracture of the fifth finger of his left hand. He also sustained abrasions to his body and fractures of two of his ribs. The plaintiff also complained of back pain subsequent to April 5. At the hospital on April 5, the wounds to his head were sutured, numerous x-rays were taken (although the fractured ribs were not then discovered), his fractured finger was splinted, a tetanus shot was administered, and medication for pain was prescribed. He was then released with instructions that he be returned on April 7 (April 5 was a Saturday) to see a Dr. Kritter, an orthopedic specialist.

On April 7, a Dr. Katzoff, a chest specialist who performed work for Waukesha County, examined the plaintiff at the jail. He noted in a memo after the examination that "Pt. [patient] will receive follow up by Kritter, an orthopedist, who presumably has access to the x rays." Bonnie Leverans, then a nurse at the jail attempted to make an appointment for the plaintiff to see Dr. Kritter, but shortly afterward she was told by Lt. Lynch that for security reasons he would not permit the removal of the plaintiff from the confines of the jail.

On April 9, 1980, the plaintiff was transferred to Central State Hospital for the mandatory evaluation necessitated by his conviction for sexual assault. The plaintiff's medical records were sent with him to Central State and the records reflected the injuries the plaintiff had sustained during the struggle with the officers on April 5, 1980.

On April 15, 1980, the plaintiff received a physical examination by a physician at Central State Hospital, which examination revealed the nature of plaintiff's fractured finger and other complaints. The plaintiff also had x-rays of his fractured finger taken on June 23 and July 11, 1980, while an inmate at the State Prison and he also had other subsequent medical examinations in June, July, August and September of 1980, as evidenced by his patient's Daily Progress Reports.

Edwin Fischer, M.D., who is a practicing physician in Lake Mills, Wisconsin, was called by the plaintiff to testify about the nature and extent of the plaintiff's permanent injuries. The plaintiff also testified at length about the injuries he sustained. Dr. Fischer examined the plaintiff shortly after the plaintiff's arrival in 1980 at the prison at Waupun and again three days before the trial began. He testified that, with respect to the plaintiff's head injuries, the plaintiff still complains of dizziness and frequent and pounding headaches—testimony that was corroborated by the plaintiff, himself—and that the dizziness and headaches are of the kind that could be related to blows to the head. In addition, the lacerations to the head have left permanent scars on plaintiff's head which are covered by his hair.

With regard to his fractured finger, the plaintiff cannot close his hand to make a fist. The finger continues to be painful, a result, Dr. Fischer said, of decreased flexion in all of the joints of the finger, a gross bone deformity, and a crepitation of the tendons. The condition is a permanent one, preventing the plaintiff from performing such simple tasks as typing, holding a baseball bat, and catching a football. He also cannot punch a speedbag or lift weights—hobbies that he enjoyed prior to the inci-

dent of April 5, 1980. Because of the presence also of small scars on both of the plaintiff's hands, Dr. Fischer said that the plaintiff's injuries in this regard were consistent with an attempt to ward off blows to the head.

The plaintiff also continues to suffer from what he described as "grabbing pain" and what Dr. Fischer called muscle spasms in the plaintiff's back. The plaintiff no longer complains of pain from the fractures of his left 8th and 9th ribs.

## III. LIABILITY

The Court must now consider whether the facts of this case demonstrate liability on the part of any or all of the defendants. The plaintiff in his post-trial submissions concedes and the Court finds that there is no liability under section 1985 or 1986. The evidence does not support a finding of conspiracy under section 1985(3) because of the absence of a class-based animus and liability under section 1986 is dependent upon proof of conspiracy. *See Hampton v. Hanrahan*, 600 F.2d 600, 623 (7th Cir. 1979), *rev'd in part on other grounds, cert. denied in part and granted in part*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670, *reh'g denied sub nom. Johnson v. Hampton*, 448 U.S. 913, 101 S.Ct. 33, 65 L.Ed.2d 1176 (1980), and *Williams v. St. Joseph Hospital*, 629 F.2d 448, 452 (7th Cir.1980). The Court thus turns to section 1983.

The Second Circuit Court of Appeals in *Johnson v. Glick*, 481 F.2d 1028, 1029 (2d Cir.) *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) provided what has become a classic test for determining when the use of force by a prison guard rises to the level of a constitutional violation cognizable under section 1983.

> The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033. On the need for the application of force, the plaintiff argues that there was no legal justification for the three guards who are the defendants here to have entered the segregation cell because the plaintiff was not then posing a threat to himself, to other inmates or to any guards. The Court does not agree with this analysis. The guards and the jail administrator believed that the plaintiff had a metal object. It is not inconceivable that the plaintiff, frustrated at what he perceived to be the injustice of being unfairly placed in the hole, could have used the object to injure himself or, more likely, to throw it at one of the guards. The fact that the plaintiff did not swing the towel at Ware or Goodyear when they stood near the bars of the cell talking to him does not insure that the prisoner would not at some point use the object against a guard. And while it is true that there was no prisoner in any cell immediately adjacent to plaintiff, there was testimony that the plaintiff was shouting threats at guards and making loud banging noises with the object in the towel which were riling up other prisoners. The Court believes that such a disturbance within hearing distance of other prisoners is a situation which prison officials must terminate to insure the good order of the facility as a whole. The evidence is clear that several attempts were made to persuade the plaintiff to give up the object peacefully before there was any resort to force. Thus, the Court does not believe that the entering of the cell by the guards with the intention to forcibly remove the object from the plaintiff's possession was unreasonable per se.

## A. Defendants Goodman, Hafeman, Ware

■ The Court believes that the conduct of the three guards who entered the cell must be evaluated individually. Plaintiff's own testimony was that Goodyear did not strike him and, in fact, attempted, at least verbally, to restrain Ware. The mere fact that Goodyear assisted in subduing the plaintiff, who had struck him in the face with the liquid and the towel, was not unreasonable under the circumstances. The Court finds that Goodyear is not liable for a violation of plaintiff's rights.

■ The issue is closer regarding Hafeman. The significant difference between the involvement of Goodyear and Hafeman is that Hafeman entered the cell while carrying ankle restraints which, according to the testimony of plaintiff and inmate Thomas Henry, he had wrapped around his hand. While it might be justifiable for an officer to carry a weapon if he were required to enter a cell alone to attempt to subdue a prisoner who possessed a weapon, the Court does not believe it was necessary in this case where three guards were entering the cell. The photographs of the severe bruises plaintiff received lead the Court to believe that Hafeman struck the plaintiff with the ankle restraints. The Court believes this amount of force was unreasonable under the circumstances and finds Hafeman liable for a violation of plaintiff's constitutional rights.

■ Finally, the Court turns to Officer Ware. There is no doubt in the Court's mind that Ware used excessive force. Ware's testimony that he was carrying the large flashlight when he entered the cell because he was afraid of losing it unless he kept it with him is patently incredible. The Court finds that Ware carried the flashlight for the sole purpose of using it as a weapon against the plaintiff. What is most disturbing to this Court is the fact that Ware struck at least three blows to plaintiff's head. While the plaintiff's injuries were certainly serious, such blows to the head could have resulted in even more serious and potentially fatal, injuries. This

amount of force, in a situation where there was no threat to the life of a guard or another inmate, was completely unjustified. The Court can only conclude, when Ware was being backed up by two other guards, that his decision to strike the plaintiff on the head repeatedly with a heavy flashlight, was not a good faith effort to maintain discipline but rather was done maliciously for the purpose of causing harm. The Court finds Ware liable for a violation of the plaintiff's constitutional rights.

B. *Defendants Klink, Lynch, Gaieck & Waukesha County*

■ The Court must now consider whether the excessive force employed by Hafeman and Ware was the result of a policy or custom of Waukesha County and whether supervisory officials Gaieck, Lynch and Klink are independently liable. In *Monell v. Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018 (1978), the Supreme Court held that local governmental bodies "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Such a policy or custom can be inferred from the informal acts or omissions of supervisory officials of the public body. *Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Prison supervisors may be held independently liable under section 1983 when they are deliberately indifferent to or when they tacitly authorize "a pervasive and unreasonable risk of harm" to prisoners. *Opriano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981).

In support of his contention that the beating he received on April 5, 1980, was the result of a policy or custom of Waukesha County, the plaintiff points to the fact that no written policy or procedure manual existed for the operation of the jail at the time of the incident. The defendant also relies heavily on a statement contained in the so-called "Kuharich Report." (D. Ex. 14).

In 1981, Sheriff Klink requested the National Institute of Corrections for a staffing analysis of the existing jail and recommendations for staffing after planned jail remodelling was completed. Jail Consultant Anthony Kuharich visited the jail June 2–4, 1981, and as part of his written report included the following:

POLICY AND PROCEDURAL MANUAL

Currently, a policy and procedural manual is being developed and written for the Sheriff's Department, a part of which will pertain to the jail. To date, only the section on medical service has been developed and published to qualify for certification by the American Medical Association.

It is essential that this jail have a published manual spelling out well-defined goals, policies, and procedures for its operations as quickly as possible. Otherwise, this facility will continue to be "managed by crisis." In one instance this Consultant observed the acting Shift Supervisor looking up the records to inform a telephone caller whether a certain individual was still in jail custody. During this same time there were four corrections officers on the ground floor where there is no inmate housing while there were no male corrections officers on the first and second floors where the inmate living units are located. The Supervisor was doing clerical work, while the corrections officers were not performing their primary task of visually supervising the inmates. In another instance, a corrections officer advised the Jail Administrator that two prisoners were being transferred to the Huber Law Facility and that one's jacket and the other's trousers were missing from the inmate property room. The Jail Administrator's remarks were "We'll fix them up with clothes from salvage." Subsequently, someone said that inmate personal property is occasionally missing from this room. There are no written procedures for handling inmate personal

property or who has access to the inmate property room.

Minimally, procedural policy should embody the goals of security, safety, appropriate training for staff, humane care of inmates, and maintenance of the prisoners' physical and mental-well-being, together with responsible concern for inmates' rights and privileges. The manual should include rules and regulations governing supervision of inmates by staff.

Without clear-cut administrative guidelines the administration loses control of operation policy. Programs and procedures, developed over the years in the press of emergent experience, become operational policy by administrative default. Only when such experience falls short or a new or emergent crisis arises, does the policy become subject to administrative concern and cause development of an administrative regulation. Otherwise, personnel operate autonomously and make independent decisions.

The procedural manual must be based upon sound custodial and correctional philosophy. It must be suitable for operation purposes and staff training.

The plaintiff refers to the "management by crises" language several times. The plaintiff concludes on the basis of Kuharich's report that Klink, Lynch, and Gaieck were responsible for a policy or practice which "permitted the use, in the officers' discretion, of whatever force was necessary to accomplish the desired end."

The Fourth Circuit in *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir.1983) recently summarized the state of the law on the liability of a governmental body for failure to adequately train and supervise its law enforcement personnel.

A number of courts have interpreted *Monell* to hold that a municipal policy of authorizing or condoning police misconduct can be inferred where the municipality has been grossly negligent in the supervision and training of its police force. *See, e.g., Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981); *Owens v. Haas*, 601 F.2d 1242, 1246–47 (2d Cir.1979), *cert. denied*, 444 U.S. 980, 100

S.Ct. 483, 62 L.Ed.2d 407 (1979); *Popow v. City of Margate*, 476 F.Supp. 1237, 1245–46 (D.N.J.1979); *Leite v. City of Providence*, 463 F.Supp. 585, 590–91 (D.R.I.1978).

 Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse. Only then may knowledge be imputed to the supervisory personnel. *See Bowen v. Watkins*, 669 F.2d 979, 988–89 (5th Cir. 1982). *See also McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir. 1981), *cert. denied*, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability. *See Berry v. McLemore*, 670 F.2d 30 (5th Cir.1982); *Avery v. County of Burke*, 660 F.2d [111] at 114 [(4th Cir.1981)] *Opriano v. Johnson*, 632 F.2d 1096 (4th Cir.1980), *cert. denied*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1982).

*Herrera v. Valentine*, 653 F.2d 1220 (8th Cir.1981) demonstrates the type of case in which a municipality has been held liable for a continuing failure to remedy the known unconstitutional conduct of its police officers. In *Herrera*, Indian residents of the City of Garden had complained repeatedly to authorities of continuing police misconduct such as excessive force, sexual misconduct, racist conduct and selective enforcement of laws. When the city failed to respond to these complaints, an Indian woman named Yellow Bird wrote to the Director of the Nebraska Indian Commission and the Commission conducted a hearing on the complaints. The Commission subsequently asked the City to remedy the situation and report back to it. However, the city took no action. Later the County District Attorney's office and an outside agency concluded that the city's police force considered themselves overlords. Subsequent to this type of notice to city officials, Yellow Bird was beaten and kicked while City of Gordon police officers were arresting her husband and her unborn

child died. The Eighth Circuit Court of Appeals affirmed a jury verdict against the city concluding that an informal policy or custom under the *Monell* doctrine had been established.

■ The Court has reviewed the evidence presented in this case and concludes that the plaintiff here has failed to demonstrate that a policy existed in Waukesha County which authorized excessive force by guards in the county jail. It is true that there was no written policy on how to subdue an inmate in the situation which presented itself on April 5, 1980. However, Hafeman and Goodyear as well as another officer who was not involved in the incident, Henry Bielmeier, each testified that they were advised to use minimal force. Defendant has failed to point to any other incidents of excessive force which would suggest a pattern of widespread abuse which could be imputed to Klink, Lynch, Gaieck and the County. As for the Kuharich report and its reference to "managing by crisis," the Court believes that read in context, the remark suggests no more than that the lack of written procedures forced personnel at the Waukesha County Jail into a position of "reacting" rather than acting when a problem occurred. While such a situation demonstrates poor management, the Court cannot find on the record before it that it demonstrates gross negligence. Accordingly, the Court finds no liability on the part of defendants Klink, Lynch, Gaieck or Waukesha County for the excessive force employed here.

### C. *Follow-Up Medical Treatment*

■ The plaintiff asserts that his constitutional rights were violated not only by the beating he received in his cell on April 5, 1980, but also by the failure of jail personnel to provide follow-up medical treatment for his injuries. As has been discussed above, plaintiff was transported to a hospital emergency room for treatment immediately after he was injured. The hospital discharge sheet indicated that he should be seen by an orthopedist on April 7. Lieutenant Lynch, however, told the jail nurse on April 7 not to make the

doctor's appointment for plaintiff because he was a security risk. The plaintiff was transferred to Central State Hospital on April 9 and his records were sent with him.

On these facts, the Court finds no constitutional violation. Jail personnel acted properly in seeking immediate treatment for plaintiff on April 5. In retrospect, Lynch's decision not to take the plaintiff to an orthopedist on April 7 may be questioned. However, this Court cannot say that concerns about security were totally unjustified on April 7. Plaintiff had been found with contraband which suggested possible involvement in a jail break attempt. The injury to plaintiff's finger was not so serious that it was cruel and inhuman punishment or a violation of due process to delay treatment. The plaintiff was due to be transferred within several days and Waukesha officials knew that the plaintiff would be examined at Central State. The Court finds no constitutional violation in the failure of county personnel to take plaintiff to an orthopedist on April 7.

### IV. DAMAGES

■ The Court has set forth in detail above the injuries sustained by the plaintiff on April 5, 1980. Although the plaintiff continues to complain of dizziness and headaches, as well as back pain, the only tangible permanent effects of his injuries are the scars on his head (which are covered by his hair) and the deformity in the fifth finger of his left hand. The injury to his finger prevents plaintiff from participating in sports and hobbies he formerly enjoyed. Having considered the matter, the Court concludes that the sum of $2,000 will reasonably and adequately compensate the plaintiff. The Court declines to award any punitive damages.

### V. CONCLUSION

It is hereby **ORDERED** that judgment be entered against the defendants Jackie Ware and Michael Hafeman, jointly and severally, in the amount of $2,000. Subsequent to, and within 90 days of entry of

judgment, counsel for the plaintiff shall apply to the Court, pursuant to 42 U.S.C. § 1988, for a determination of their fees to be added to the judgment based upon the fees incurred in the litigation of this action.